# EXHIBIT 2

DANIEL E. ALBERTI (SBN 68620)
dalberti@mwe.com
McDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA 94025
Telephone: (650) 815-7400
Facsimile: (650) 815-7401

MARGARET H. WARNER (admitted *pro hac vice*)
mwarner@mwe.com
RAYMOND A. JACOBSEN, JR. (admitted *pro hac vice*)
rayjacobsen@mwe.com
JON B. DUBROW (admitted *pro hac vice*)
jdubrow@mwe.com
McDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, N.W.
Washington, D.C. 20001
Telephone: (202) 756-8000
Facsimile: (202) 756-8087

Attorneys for Defendant
CONSTELLATION BRANDS, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STEVEN EDSTROM, BARRY GINSBURG, MARTIN GINSBURG, EDWARD LAWRENCE, SHARON MARTIN, MARK M. NAEGER, JOHN NYPL, DANIEL SAYLE, WILLIAM STAGE,<br><br>Plaintiffs,<br><br>vs.<br><br>ANHEUSER-BUSCH InBEV SA/NV, GRUPO MODELO S.A.B. de D.V., and CONSTELLATION BRANDS, INC.,<br><br>Defendants. | Case No. C-13-1309 MMC<br><br>Assigned to Hon. Maxine M. Chesney<br><br>**DECLARATION OF PAUL HETTERICH IN SUPPORT OF DEFENDANT CONSTELLATION BRANDS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** |

I, F. PAUL HETTERICH, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am Executive Vice President, Business Development and Corporate Strategy, for Constellation Brands, Inc. ("Constellation"). In this declaration, when I refer to "Constellation," I mean Constellation Brands, Inc. and/or one or more of its subsidiaries. I have served in this position since 2003 and have been with Constellation since 1986. My primary responsibilities include mergers and acquisitions, strategic planning, and Constellation's overall business development activities. My statements are based on personal knowledge, including facts I have learned in the normal course of our business and knowledge I have acquired during my work in connection with the original proposed transactions announced on June 29, 2012, and the revised transactions announced on February 14, 2013.

2. I have read the Plaintiffs' First Amended Complaint and Motion for a Temporary Restraining Order. To the extent they make allegations about Constellation, the papers are without merit as I detail below.

3. I make this declaration in support of Defendant Constellation's Opposition to Plaintiffs' Motion for a Temporary Restraining Order.

4. Constellation currently holds a 50 percent interest in Crown Imports LLC ("Crown"), a joint venture between Constellation and Grupo Modelo S.A. de C.V. ("Modelo"). Crown serves as the sole U.S. importer of Modelo brand beer and has the exclusive right to market, distribute, and sell Modelo brand beer in the United States. Constellation participates in the management and oversight of Crown by virtue of controlling four of the eight seats on Crown's Board of Directors.

**DESCRIPTION OF TRANSACTIONS**

5. In connection with, and contingent upon, the acquisition by Anheuser Busch InBev SA/NV ("ABI") of the remaining interest in Modelo that it does not already own, Constellation agreed in June 2012 to buy the remaining interest in Crown that it does not already own for $1.85 billion. As a result of that purchase, Crown would become a wholly owned subsidiary of Constellation.

6. The Department of Justice Antitrust Division ("DOJ") conducted an investigation of the ABI-Modelo transaction. That investigation lasted nearly a year. During that investigation, DOJ requested and obtained thousands of documents from Constellation and Crown. DOJ interviewed many wholesalers and retail customers to understand the market and its competitive dynamics and deposed six Crown and Constellation executives. Constellation gave or participated in several presentations to DOJ and spent millions of dollars complying with DOJ's requests. On January 31, 2013, DOJ sued to block the ABI-Modelo transaction, alleging it would harm competition.

7. On February 13, 2013, Constellation additionally agreed to acquire Grupo Modelo's newest, largest, and most efficient brewery, located in Piedras Negras, Mexico, and a perpetual, exclusive, paid-up license to produce, market, and sell in the United States certain Modelo brands, for an additional $2.9 billion. The Piedras Negras plant currently has a nominal capacity to brew 10 million hectoliters. As part of a commitment to resolve concerns of the DOJ, Constellation has committed to expand the brewery to a nominal capacity of 20 million hectoliters by the end of 2016. As a result, Constellation will become fully self-sufficient, able to produce all the beer needed to meet U.S. demand for the Modelo brands.

8. On April 19, 2013, the DOJ completed its investigation of the proposed transactions and filed a consent decree in federal district court outlining the terms under which the transactions could proceed. On April 25, ABI announced that it had completed the acquisition of two Modelo subsidiaries that gave ABI a majority of Modelo's voting shares and effective control of Modelo. On May 1, ABI announced that it launched a tender offer in Mexico to acquire the outstanding shares of Modelo it does not already own. According to the announcement, that tender offer expired on May 31. It is my understanding that earlier today, June 4, ABI completed its acquisition of the Modelo shares that had been tendered; ABI now owns 95% of Modelo. After that, on Friday, June 7, Constellation will make three separate wire transfer payments for the Piedras Negras brewery, the intellectual property associated with Modelo's U.S. business, and the ownership interest in Crown that Constellation does not already own, and will take ownership of those assets.

**DECLARATION IN SUPPORT OF CONSTELLATION'S OPPOSITION TO TRO** - 3 - **CASE NO.: C-13-1309-MMC**

9. In my role as Executive Vice President, Business Development and Corporate Strategy, I participated actively in the negotiations of both the June 2012 agreements and the February 2013 agreements. I interfaced with ABI executives and managed Constellation's due diligence. I am very familiar with the terms of these deals and the negotiations that occurred in relation to them. I also participated extensively in providing information to DOJ during its investigation. I will be the person with primary responsibility within Constellation to ensure that Constellation complies with its obligation to expand the Piedras Negras brewery.

## CONSTELLATION HAS THE FINANCIAL AND OPERATIONAL CAPABILITY TO OPERATE THE U.S. MODELO BUSINESS

10. Constellation is a very capable buyer of the Crown interest and the Piedras Negras brewery (together, the "Divestiture Assets"). Constellation has substantial experience in the beer industry such that the transition in ownership for Crown will be seamless and without difficulty. Moreover, Constellation has the financial wherewithal both to complete the purchase of these Divestiture Assets and to complete the expansion of the Piedras Negras brewery.

11. Constellation has been in the beverage alcohol industry since the company was formed in 1945. Since that time, Constellation has grown to become the world's largest premium wine producer. It operates or owns interests in wineries and other beverage alcohol production facilities in seven countries around the world. Constellation produces, markets and sells numerous premium wine brands, including Robert Mondavi®, Woodbridge®, and Ravenswood®. It also produces and sells SVEDKA Vodka®. Constellation's products are sold in a total of more than 120 countries.

12. Constellation has been involved in the beer business for twenty years, since it purchased Barton Beers ("Barton") in 1993. At that time, Barton served as the sole importer for Modelo brand beer in the western United States. Barton also operated a brewery in Wisconsin producing other brands for a time. Under the constant stewardship of Constellation, Barton continued in its role as a U.S. importer for Modelo until 2007, when Modelo unified its U.S.

1  importer structure through the Crown joint venture with Constellation. As part of that formation,
2  Constellation contributed to Crown all of the Barton management and staff.

3  13. Any suggestion that Constellation cannot afford these transactions is unfounded
4  and patently untrue. In connection with this transaction, Constellation has secured financing from
5  a consortium of major U.S and international banks to cover the entire $4.75 billion purchase
6  price. These banks have carefully underwritten their loans, and each has determined that the
7  additional debt load incurred by this financing will not unduly burden Constellation's business.
8  Constellation typically maintains a debt level of approximately three to four times earnings,
9  which is relatively conservative compared with other companies in the industry. As a result of
10 these transactions, Constellation's debt-to-earnings ratio will rise to approximately five times
11 earnings, which is still within the range of that carried by many significant peers in the beverage
12 alcohol industry. In fact, Constellation anticipates, using conservative projections, reducing its
13 debt load back down to our normal three to four times earnings level within approximately two
14 years of closing because of the increased cash flow from the beer business as a result of this
15 transaction. Constellation has used debt financing in other large transactions we have done in the
16 past. That financing has taken our debt ratio above our three to four times earnings target, and we
17 have always been able to reduce the debt back to our target levels. It is typical for companies in
18 this industry to finance transactions by increasing debt and using the profits from the acquired
19 business to pay the debt down to typical levels for the company. The major credit rating agencies
20 have fully reviewed the transaction and have reaffirmed Constellation's strong credit rating,
21 including the increase in debt leverage required for the transaction.

22 14. Constellation has the capability and know-how to manage the Piedras Negras
23 brewery and compete vigorously in the U.S. beer business.

24 15. The purchase of the Piedras Negras brewery is structured as a purchase of two
25 companies: the company that owns the brewery assets and the company that provides services at
26 the brewery, including the personnel that operate and manage the brewery on-site. As a result,
27 virtually all of those brewery employees, up to and including the brewery manager, will remain in
28

DECLARATION IN SUPPORT OF
CONSTELLATION'S OPPOSITION TO TRO — - 5 - — CASE NO.: C-13-1309-MMC

their positions after the transaction has been completed. Consequently, the brewery will continue to be run by the same personnel after the transaction.

16. All brewery personnel will be employed by and compensated by Constellation as of the date of the completion of the transaction. Neither ABI nor any other third party will contribute in any way to the compensation of those employees. Constellation employees will operate and manage the brewery. ABI will provide a limited amount of transition services as requested by Constellation for a period of up to three years, terminable at any time, in order to facilitate the smooth transition of the Piedras Negras brewery out of the Modelo network. Constellation intends to terminate those transition services as soon as reasonably practicable. During that period and into the future, Constellation and Crown will conduct its business so as to compete vigorously with ABI and other competitors.

17. In addition to its long history of participation in the beer industry, Constellation has an even longer history in the production of wine and other beverage alcohol, including production at very large facilities with varying levels of automation, such as our Robert Mondavi Woodbridge® winery in Acampo, California. Also, for many years, Constellation was the second largest cider producer in the United Kingdom.

18. Many of the same commodities are purchased for the production of wine as they are for beer, including glass, labeling, cardboard, and yeast. Wine production is more complex than beer production because of the variability in grape production from season to season created by unexpected weather patterns, among other factors.

19. DOJ, aided by its own industry experts, has vetted and approved Constellation as a buyer of the Divestiture Assets. DOJ's investigation of the proposed transaction involved months of intensively interviewing Constellation personnel and reviewing Constellation's business plans, capital plans, and long-term financial projections. After the initial deal was challenged by DOJ and then restructured by ABI and Constellation to resolve its concerns, DOJ spent another two months specifically investigating Constellation's financial wherewithal, its competitive incentives, and its experience in the production, marketing, and sale of beer and related products. DOJ conducted an additional deposition to fully affirm its findings and cement Constellation's

1  competitive commitment. As a result of that investigation, DOJ agreed that Constellation could
2  use the assets to step into the shoes of Modelo and vigorously compete, independent of ABI's
3  influence.

4  20. Constellation has received, as part of the transaction, everything it needs to
5  compete vigorously with ABI and all other competitors. Once the expansion of the brewery is
6  complete and production has ramped up, Constellation will no longer request any supply,
7  transition services, or other services from ABI related to the production or sale of beer.
8  Moreover, Constellation will obtain from ABI, pursuant to an Interim Supply Agreement ("ISA"),
9  all the beer it needs beyond the current capacity of the Piedras Negras for a period of up to three
10  years. During the term of the ISA, ABI cannot alter any of the pricing terms without
11  Constellation's consent. Pricing is determined for the length of the contract.

12  21. The February 2013 agreement to purchase the Divestiture Assets is not fraudulent.
13  That agreement is accurately represented in the transaction documents. Versions of those
14  documents which were filed with the U.S. Securities and Exchange Commission are available at
15  Constellation's website on our investor relations page. Those documents state all the terms of the
16  agreement between ABI and Constellation, including what Constellation will purchase from ABI
17  during the transition (and at what price) and what interim supply and support relationships will be
18  maintained with ABI during the transition. Each of these agreements, as well as the transaction
19  as a whole, was reviewed intensively by DOJ to make sure that the details of the transaction did
20  not provide means for anticompetitive harm.

**NO PRICE-FIXING / VIGOROUS COMPETITION**

23  22. I have read the allegations in the Plaintiffs' First Amended Complaint and the
24  assertions in the Motion for a Temporary Restraining Order in which they contend that
25  Constellation and ABI have agreed to fix prices. Those assertions are without merit. At no time
26  during the negotiations of either set of agreements did Constellation tacitly or explicitly agree
27  with ABI to raise or fix prices. Constellation has not promised to enter into a future agreement
28  with ABI to raise or fix prices. Constellation's acquisition of Modelo's interest in Crown is not

DECLARATION IN SUPPORT OF
CONSTELLATION'S OPPOSITION TO TRO — - 7 - — CASE NO.: C-13-1309-MMC

1 contingent upon an agreement or promise to agree with ABI to raise or fix prices. Constellation's
2 acquisition of the Piedras Negras brewery is not contingent upon an agreement or promise to
3 agree with ABI to raise or fix prices. Constellation has no intention to enter into an agreement or
4 promise to agree with ABI to raise or fix prices.

23. Constellation has every intention to continue Crown's history of competing vigorously against all beer brands sold in the United States. Constellation affirms its dedicated commitment to actively grow Crown's market share, embodied in Crown's stated aspiration to achieve a twenty percent market share by revenue, much of which will come at the expense of ABI. Constellation's support of that vision includes its support for Crown's current and future plans to innovate and to introduce new brands to the market, even beyond the initial brands included in the Divestiture Assets.

24. The Complaint makes allegations in paragraphs 22-25, among others, regarding Constellation's past history of pricing incentives and inclinations with regard to Crown. Constellation's relationship with Crown and incentives going forward will be fundamentally different from those that have been in place under the Crown joint venture. Constellation and Modelo's joint venture agreement to establish Crown provided for an initial term of ten years, slated to expire on December 31, 2016. At any time up to three years prior to the end of that initial term, Modelo can notify Constellation that it intends to purchase Constellation's interest in Crown at the end of the term. Modelo has indicated that it intended to purchase Constellation's interest at the end of the term. Modelo's intention to exercise its "call option" has colored Constellation's view of its investment in Crown, and led to some differences in philosophy with Modelo. As a consequence of what had the potential to be a relatively short-term interest in the Crown venture compared with Modelo's, Constellation has sometimes had less incentive to invest in the long-term growth of the Modelo brands. Constellation, unlike Modelo, did not share in the brewer's profit, and it had only a temporary interest in the brands in the U.S. Constellation's incentives were fundamentally different than Modelo's under the Crown joint venture.

25. Under the February 2013 agreements, Constellation has every incentive to invest in Crown and the long-term health of the brands Crown sells. As the owner of both a brewery

DECLARATION IN SUPPORT OF
CONSTELLATION'S OPPOSITION TO TRO - 8 - CASE NO.: C-13-1309-MMC

1   which will soon have an annual capacity of 20 million hectoliters and of the perpetual brand
2   licenses in the United States of certain Modelo brands, Constellation's incentive is to utilize the
3   brewing capacity of Piedras Negras as efficiently as possible and to drive sales to enhance the
4   long-term health the Crown brands and to build brand loyalty. Constellation's incentives going
5   forward are comparable to what Modelo's had been under the Crown joint venture.

6   26. The allegation in paragraph 107 of the Complaint that Constellation will fire
7   Crown executives as part of some "Machiavellian plan" with ABI is patently false. In fact, our
8   plans call for increasing significantly the support for Crown and staffing levels in that business.

## HARM TO CONSTELLATION OF CLOSING DELAY

11  27. If the closing of Constellation's acquisition of Modelo's U.S. business is delayed,
12  Constellation will suffer material harm. This transaction is transformational in that it effectively
13  doubles Constellation's revenues as we go from being half-owner of a non-producing importer to
14  becoming the third largest brewer of beer sold in the United States. Investors and analysts are
15  very bullish on this deal and its effect on our company. On the first day of trading after the initial
16  deal was announced, our stock price leaped from the prior day's closing price of $21.75 per share
17  to a closing price of $27 per share (a 25% increase) and then continued to rise. On the day
18  following the initiation of DOJ's lawsuit, the stock price fell from just above $39 per share to just
19  above $32 per share (a drop of more than 20%). When the revised agreement was announced
20  February 14, 2013, the stock price rose from less than $32 per share to nearly $44 per share (a
21  37% increase) and has steadily climbed, so that the most recent closing prices have been above
22  $50 per share. It is clear that investor sentiment toward the deal has been overwhelming positive.
23  The terms of the transaction have been hailed by industry and investor analysts that have followed
24  the company. Therefore, it is important to Constellation that the deal be completed expeditiously
25  to avoid diminishing value for our investors.

26  28. Delaying the completion of the deal also has the potential to negatively affect
27  Constellation's financing arrangements. Constellation has secured financing through the end of
28  the year. Constellation must pay a $1 million non-recoverable fee to the banks that are financing

**DECLARATION IN SUPPORT OF CONSTELLATION'S OPPOSITION TO TRO** - 9 - **CASE NO.: C-13-1309-MMC**

the transaction because of commitments made in support of the closing scheduled for this week. If the closing were delayed that fee could be lost. Beyond the lost closing fees, like all debt, interest and fees on that financing continue to increase with time and must be paid by Constellation. Constellation must pay an average of $250,000 per day in financing charges for each day the deal is delayed. That figure increases in mid-June and at certain dates thereafter. Moreover, an unwarranted delay would threaten the favorable financing terms obtained by Constellation. As part of this deal, Constellation received the best financing rates for a non-investment grade company since the economic crisis. However, those terms could worsen considerably if the deal does not close as expected in June. The lenders have the ability to withdraw their commitments to the favorable financing terms we have in place, and the terms could become less favorable. Finally, a significant delay could threaten the financing arrangement altogether. If the deal is not completed by December 31, 2013, the financing arrangement lapses, and Constellation will forfeit approximately $80 million in financing costs, which have been incurred to date. Any delay in the closing of the transaction will increase our financing fees and will increase considerably Constellation's debt servicing burden.

29. In addition, for each day the transaction is not closed, Constellation loses the profit it would have gained as beneficial owner of the Divestiture Assets. That loss totals in excess of $2 million *per day*.

30. Delaying the completion of the deal also threatens Constellation's ability to complete the expansion of the Piedras Negras brewery by the end of 2016, as promised to DOJ. As a condition of approving the ABI-Modelo transaction, the DOJ required the sale of the Divestiture Assets to Constellation or another suitable purchaser. Because those assets do not currently have sufficient production capacity to meet all U.S. demand for the Modelo brands, DOJ is requiring Constellation to commit, under court order, to completing an expansion of the Piedras Negras brewery by the end of 2016. Constellation is committed to meeting that deadline, but any extended delay in the closing hampers our ability to comply with that commitment.

31. A TRO would create substantial uncertainty that would be disruptive to Constellation's business operations and to its employees and business partners, including beer distributors.

I declare under penalty of perjury that the foregoing is true and correct. Executed this fourth day of June, 2013 in Victor, New York.

                                  ___/s/__ F. Paul Hetterich_____
                                           F. Paul Hetterich