1  Joseph M. Alioto (SBN 42680)
2  Theresa D. Moore (SBN 99978)
   Thomas P. Pier (SBN 235740)
3  Jamie L. Miller (SBN 271452)
4  **ALIOTO LAW FIRM**
   One Sansome Street, 35th Floor
5  San Francisco, CA  94104
   Telephone: (415) 434-8900
6  Facsimile:  (415) 434-9200
7  Email: jmalioto@aliotolaw.com

8  [ADDITIONAL COUNSEL LISTED ON LAST PAGE]

9

10            **UNITED STATES DISTRICT COURT**

11           **NORTHERN DISTRICT OF CALIFORNIA**

12              **SAN FRANCISCO DIVISION**

13

14  STEVEN EDSTROM, BARRY GINSBURG,      )   CASE NO.: 3:13-CV-1309-MMC
15  MARTIN GINSBURG, EDWARD              )
    LAWRENCE, SHARON MARTIN, MARK        )   **SECOND AMENDED AND**
16  M. NAEGER, JOHN NYPL, DANIEL         )   **SUPPLEMENTAL COMPLAINT**
17  SAYLE, WILLIAM STAGE,                )   **FOR INJUNCTIVE RELIEF TO**
                                         )   **PROHIBIT THE ACQUISITION**
18          Plaintiffs,                  )   **OF GRUPO MODELO BY**
                                         )   **ANHEUSER-BUSCH INBEV AS**
19                                       )   **A VIOLATION OF SECTION 7**
       v.                               )   **OF THE CLAYTON ANTI-**
20                                       )   **TRUST ACT, 15 U.S.C § 18, TO**
21                                       )   **PREVENT PRICE FIXING IN**
    ANHEUSER-BUSCH InBEV SA/NV,          )   **IN VIOLATION OF SECTION 1**
22  GRUPO MODELO S.A.B. de C.V.,         )   **OF THE SHERMAN ANTI-**
    and CONSTELLATION BRANDS, INC.,      )   **TRUST ACT, 15 U.S.C. § 1, AND**,
23                                       )   **IN THE ALTERNATIVE, FOR**
24          Defendants.                  )   **DIVESTITURE AND DAMAGES**
                                         )   **AND DEMAND FOR JURY**
25                                       )   **TRIAL**
26  _____  )
27

28

## COMPLAINT

Plaintiffs by and through their undersigned attorneys, bring the following Complaint against Defendants Anheuser-Busch InBev NV/SA (hereinafter "ABI"), Grupo Modelo S.A.B. de C.V. ("Modelo"), and Constellation Brands, Inc. ("Constellation") to prohibit the proposed $20 billion acquisition of Modelo by ABI; to prohibit the anticipated price-fixing among Constellation, Modelo and ABI; to require compliance with the Tunney Act; and, in the alternative, should the combine be finalized, divestiture of Modelo and Anheuser-Busch, and damages, plaintiffs therefore alleging as follows:

## INTRODUCTION

1.     ABI is the 2008 combination resulting from the acquisition by InBev, the largest brewer in the world, controlled by families in Brazil and based in Belgium, of Anheuser-Busch, the largest brewer in the United States.  ABI, the combination of Anheuser-Busch and InBev, controls approximately 50% of the manufacture, distribution, and sale of beer in the United States.  ABI is a foreign-absentee owner.

2.     MillerCoors, a British company, is the 2008 combination of Miller and Coors, the previously second and third largest brewers in the United States.  MillerCoors, now the second largest brewer in the United States, has approximately 30% of the production, distribution, and sale of beer in the United States.  MillerCoors is a foreign-absentee owner.

3.     ABI and MillerCoors compete on advertising, rather than on price or quality. Both ABI and MillerCoors are now threatened by Modelo, the largest brewer in Mexico, which imports and sells its beer into the United States through Crown, an importer, distributor and wholesaler, owned 50% by Modelo and 50% by Constellation, a winemaker with no beer

*Second Amended and Supplemental Complaint*

brewery or the expertise to satisfactorily brew beer on a large scale basis for resale.  Modelo has approximately 5% of the market in the United States.

4.      Modelo products, principally Corona, are considered to be "high end" beer, commanding a higher price than so-called premium and/or premium plus beers, such as Bud and Budweiser.

5.      Since 2008, when the combinations of Anheuser-Busch and InBev and Miller and Coors were formed, the profits of the combinations have dramatically increased by reason of increase in prices.  From 2008 to 2011, the profits of ABI have increased from $1.9 billion to $5.8 billion, a threefold increase over only four years; and for MillerCoors from $2.9 billion to $5.6 billion, a twofold increase over only four years.  Together, these companies control approximately 80-85% of the beer market in the United States.  ABI and MillerCoors have steadily increased prices for their beers.

6.      In the last few years, Modelo has instituted a competitive program in order to secure more market share by refusing to increase its prices when ABI, generally followed by MillerCoors, raised its prices.  As a consequence, Modelo has constrained the planned price increases by ABI.  Although MillerCoors has consistently followed the price increases of ABI, Modelo has not.

7.      In addition to acting as a cap on ABI increases in price, the price differentials between the Modelo beers and the ABI beers have narrowed to such an extent that many consumers have "traded up" from the ABI lower-quality beers to the Modelo higher-quality beers.

*Second Amended and Supplemental Complaint*

8.      Because of the competitive program by Modelo, the following competitive effects have taken place: (1) ABI cannot raise its prices at will to the height that it wants to; (2) The narrowing of the price differential between ABI's lesser-quality beers and Modelo's higher-quality beers increases the likelihood of consumers "trading up" to the Modelo brand; and (3) The narrowing price differential requires ABI to lower its price or grant discounts and/or attempt to improve the quality of its beers so that ABI can stop the flow of consumers trading up to the Modelo brands.

9.      The Modelo importer Crown is owned 50% by Modelo and 50% by Constellation, a wine company.  Contrary to the Modelo competitive program, which has prevented the unbridled increase of ABI beer price increases, Constellation has consistently urged Crown to follow the price increases by ABI.  Crown has become very concerned that if Constellation were to take control of Crown that the Modelo competitive program would be shut down.

## SUMMARY OF THE ACTION

10.      This is a private antitrust suit brought under Section 16 of the Clayton Antitrust Act (15 USC § 26) to permanently prohibit the proposed acquisition by the largest brewer in the United States, ABI, of the remainder of Modelo, the third largest brewer in the United States, as a violation of Section 7 of the Clayton Antitrust Act (15 USC § 18) and the planned price fixing by ABI, Modelo and Constellation in violation of Section 1 of the Sherman Act (15 USC § 1).  The acquisition may, and most probably will, substantially lessen competition and/or tend to create a monopoly in the production, distribution, and sale of beer in the United States; and may probably will result in price fixing between ABI, Modelo and Constellation in ABI's scheme to have Constellation, a non-beer brewer, buy the remaining portion of Crown, the importer and

*Second Amended and Supplemental Complaint*

distributor of Modelo products, and the new Modelo brewery in Piedras Negras, and then raise and fix prices with ABI.

11.     The United States is the most profitable beer market in the world.

12.     The U.S. beer industry – which serves tens of millions of consumers at all levels of income – is highly concentrated with just two firms accounting for approximately 80% of all sales nationwide.  The proposed acquisition by ABI of Modelo and the spinoff to Constellation significantly threatens consumer welfare by the significant threatened increases in price, elimination of quality, curtailment of innovation, and destruction of consumer choice. Plaintiffs therefore seek to enjoin this acquisition and prevent a serious violation of Section 7 of the Clayton Act and a significant threat of price-fixing in violation of Section 1 of the Sherman Act.

13.     In 2008, the then-number two and number three competitors in the United States, SABMiller and Molson Coors, combined their American businesses, and now account for 30% of the market.  At the same time, InBev, the largest brewer in the United States, acquired Anheuser-Busch for $52 billion, making the combined Anheuser-Busch InBev ("ABI"), which accounts for more than 50% of the US market.

14.     The United States market is substantially more than simply "highly concentrated," as measured by the objective standards of the universally accepted Herfindahl – Hersch Index ("HHI").  (HHI measures and grades market concentration by adding the squared market share percentages of each of the competitors in the market.)  According to the Department of Justice, "Markets in which the HHI is in excess of 2500 points are considered highly concentrated."

Here, the market substantially exceeds that number, and is therefore, presumed to be ripe for probable, if not certain, collusion and a galloping tendency toward monopoly.

15.     Modelo has become an aggressive competitor of ABI and MillerCoors in the United States.  That competition has resulted in keeping prices lower than they otherwise would be, and narrowing the price gap between the lesser quality ABI beers and the higher quality Modelo beers, causing consumers to trade up to the Modelo brands and forcing ABI to either lower its prices or attempt to improve its quality, while at the same time preventing ABI from raising its prices as much as it otherwise would do in the absence of the Modelo competition.

16.     Plaintiffs are consumers and purchasers of Defendants' beers who are significantly threatened with loss and damage in the form of higher prices, fewer services, fewer competitive choices, deterioration of products, product quality, and product diversity; suppression and destruction of smaller actual competitors through exclusive distribution, full-line forcing, imitation beers, shelf space control in major chain store markets achieved by bribes and other gratuities, and the like, and other anticompetitive effects and consequences that may, and most probably will, result from the elimination of the actual and potential competition of ABI if the acquisition were to be consummated.

17.     More than 40% of the population of the United States are consumers of beer, including the beers of ABI and Modelo, and each will be adversely affected if the proposed unlawful transaction were allowed to proceed.

18.     An interdependent pricing dynamic exists between the largest brewers, ABI and MillerCoors.  These brewers find it more profitable to follow each others' price increases than to compete aggressively for market share by cutting price.  Their competition is generally confined

to advertising, rather than price or quality. ABI typically initiates annual price increases with the expectation that MillerCoors will follow. And most often, it does. Furthermore, by reason of this coordination of price increases by these two behemoths, which control 80% of the beer produced, distributed, and sold in the United States, there has been no need in the past for them to increase the quality of their beers, which have become dull and tasteless, with no perceptible taste differences between their brands.

19. Modelo has resisted ABI-led price hikes. Modelo's pricing strategy – "The Momentum Plan" - seeks to narrow the "price gap" between the higher-priced Modelo beers and lower-priced premium domestic brands, such as Bud and Bud Light (ABI brands). Modelo has put "increasing pressure" on ABI by pursuing a competitive strategy directly at odds with ABI's well-established practice of leading prices upward. In effect, Modelo has created a price war, which places a significant ceiling on the ability of ABI to increase its prices. Internal ABI documents concede Modelo's strategy was "eating [Budweiser's] lunch."

20. Because of Modelo's resistance to ABI price hikes, ABI and MillerCoors have been forced to offer lower prices and discounts for their brands to discourage consumers from "trad[ing] up" to Modelo brands. If ABI were to acquire the remainder of Modelo and puts its "puppet" Constellation in charge of the pricing of Modelo beers in the United States, this competitive constraint on ABI's and MillerCoors' ability to raise prices would be eliminated.

21. In addition, the proposed acquisition will eliminate the substantial head-to-head competition that currently exists between ABI and Modelo. The loss of this head-to-head competition will enhance the ability of ABI to unilaterally raise prices and diminish ABI's

7

incentive to innovate with respect to new brands, products, and packaging and ABI's incentive to lower prices and innovate.

22.     ABI's acquisition of the remainder of Modelo will substantially lessen competition and is therefore illegal under Section 7 of the Clayton Act, 15 U.S.C. § 18.  It will also threaten price fixing between ABI and Constellation in that according to the Department of Justice, "Constellation has already shown through its participation in the Crown joint venture that it does not share Modelo's incentive to thwart ABI's price leadership; and that, in fact, Constellation consistently has urged Crown to follow ABI's price increases."

23.     For example, in 2011, Constellation's managing director wrote to Crown's CEO:

> "Since ABI has already announced an October general price increase, I was wondering if you are considering price increases for the Modelo portfolio ... from a positioning and image perspective, I believe it would be a mistake to allow the gaps to be narrowed.  I think ABI's announcement gives you the opportunity to increase profitability without having to sacrifice significant volume."

24.     Moreover, in December 2011, Constellation's CFO wrote to his counterpart at Crown that he thought price increases on Modelo brands were viable "if domestic (i.e., Bud and Bud Light) keep going up." Modelo refused.

25.     Furthermore, a Crown executive stated unequivocally that Constellation's plan for annual price increases "put at risk the relative success" of the Momentum Plan.

26.     ABI was and is aware that its acquisition of Modelo would be a plain and contumacious violation of the law.  Consequently, ABI has concocted a fraudulent scheme to attempt to make its takeover and control of the beer industry in the United States to appear to be benign and non-threatening.  In a legerdemain not to go unnoticed, Carlos Brito, the architect of the takeover of Anheuser-Busch and the principal plotter of ABI to control beer consumption in

*Second Amended and Supplemental Complaint*

the United States, devised the shell-game plan of buying all of Modelo and then spinning off a brewery and "complete control" of Crown to Constellation, a wholly inexperienced beer brewer, which company has consistently attempted to force Crown to raise prices for Modelo products every time ABI raises its prices. In conjunction with this scheme, it is probable that Constellation has agreed with ABI, either tacitly or expressly, to fix prices by following any and all ABI price increases.

27. The first attempt by ABI to mask its hoped for effort to eliminate Modelo's competition was crude and lacked any subtlety. In June 2012, ABI entered into an agreement contingent on the approval of its acquisition of the remainder of Modelo. This agreement was designed to win antirust approval from the Department of Justice for its acquisition of Modelo, creating a façade of competition between ABI and Modelo's importer Crown. Specifically, ABI agreed to sell Modelo's existing 50% interest in Crown Imports LLC ("Crown") – which currently imports Modelo beer into the United States – to Crown's other owner, Constellation Brands, Inc. ("Constellation"). ABI and Constellation also negotiated a proposed Amended and Reinstated Importer Agreement (the "Supply Agreement"), giving Constellation the exclusive right to import Modelo beer into the United States for ten years. Constellation, however, would not acquire any Modelo brands or brewing facilities under this first arrangement – it would remain an importer and be required to depend on ABI for its supply of Modelo-branded beer. At the end of the ten-year period, ABI could unilaterally terminate its agreement with Constellation, thereby giving ABI full control of all aspects of the importation, sale, and distribution of Modelo brands in the United States.

28. After the Department of Justice filed its complaint in January 2013, Defendant ABI and Constellation on February 14, 2013, announced their second attempt to try to cover up their scheme and create a mirage of competition.

29. Under the terms of the Revised Agreement, which is conditioned on the completion of the Modelo transaction, ABI, after buying all of Modelo, would then sell to Constellation the 50% of Crown owned by Modelo, thereby setting Constellation free to do as it always wanted to do; namely, increase prices with ABI and shelve the program that was leading consumers to "trade up." ABI will also sell the Modelo Piedras Negras brewery and grant so-called "perpetual rights" to Constellation for Corona and the Modelo brands in the United States. The prices for this, which Constellation cannot afford and never intended to buy, are $1.85 billion for the interest in Crown and $2.9 billion for the interest in the brewery, thereby increasing Crown's already staggering debt by another $4.7 billion.

30. The Revised Agreement is fraudulent for the following reasons among others: (1) ABI will be running the brewery and supplying the beer production for at least three years! During that time, ABI, as the supplier of its supposed competitor, will be free to increase prices and control Constellation; (2) Constellation has consistently urged Modelo to follow ABI's price increases and Constellation will do so; (3) Constellation is not a beer brewer but one of the world's largest wine companies; (4) Constellation has no experience running a significant brewery; (5) Constellation cannot afford the purchase of the brewery or the 50% interest in Crown; (6) Constellation did not seek to buy the additional interest in Crown nor to buy a brewery; and (7) if ABI buys Modelo, the approximately 600 employees at the Piedras Negras

*Second Amended and Supplemental Complaint*

brewery will be paid by ABI and not Constellation.  In short, ABI attempts to hide and conceal its control by going through Modelo and, in turn, Constellation and, in turn, Crown.

31.     Constellation has already shown through its participation in the Crown joint venture that it does not share Modelo's incentive to thwart ABI's price leadership.  Given that Constellation was inclined to follow ABI's price leadership before the acquisition, it is unlikely to reverse course after – when it will be undergoing a three-year "transition" with ABI. During some or all of that period of time, it will be dependent on ABI for at least 40% of Crown's needs in the US Market.  Constellation will be effectively ABI's surrogate, stand-in, and puppet.

32.     Constellation has conspired with ABI, the terms of which are: (1) Constellation will purchase from ABI the Piedras Negras brewery and the so-called perpetual rights for the Corona and the Modelo brands in the US; (2) Constellation will purchase the 50% of Crown it does not already own; and (3) Constellation will follow ABI's price leads.  Furthermore, since Constellation cannot afford the brewery, Crown will be run by ABI *de facto* for three years and determine Crown's supply.  There is a further substantial probability that ABI will directly or indirectly fund all or part of Constellation's buyout provisions as well as pay for the 600 employees, to ensure ABI's control over Crown.

33.     In reality, Defendants' proposed "remedy" eliminates from the market Modelo, a particularly aggressive competitor, and replaces it with an entity with no prior beer brewing experience, an entity which has shown prior willingness to follow ABI price hikes, and which will be ABI's puppet during at least the three-year "transition" period.

34.     The cloddish second scheme was less obvious, but no less malevolent in its purpose, motive, and intent to not only eliminate Modelo but also to enlist the tacit approval of

Constellation to fix prices by raising Modelo prices whenever ABI raised prices. This scheme accomplishes the following anticompetitive effects while substantially lessening competition and tending toward monopoly: (1) Modelo's competition in price and quality will be eliminated; (2) Consumer opportunity to trade up will be eliminated; (3) Consumer choice will be eliminated on the basis of both price and quality; (4) Innovative and new products will be eliminated since the elimination of Modelo will substantially impact the need of ABI to improve or innovate its products.

35.     For the foregoing reasons, the proposed acquisition may, and probably will, substantially lessen competition and tend to create a monopoly in violation of Section 7 of the Clayton Act; and may, and probably will, result in price fixing by ABI and Constellation in violation of Section 1 of the Sherman Antitrust Act.

## JURISDICTION

36.     This action is brought under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to prevent the Defendants from consummating the acquisition as a violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18 and to prevent the probable price fixing by ABI and Constellation in violation of Section 1 of the Sherman Act.  This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, and Title 28 United States Code Sections 1331 and 1337.

## PARTIES

### *The Plaintiffs*

37.     Each of the Plaintiffs named herein below is an individual and a citizen of the state listed as the address for each such Plaintiff.  Each Plaintiff has purchased beer produced by

*Second Amended and Supplemental Complaint*

one or both of the Defendants, and each Plaintiff expects to continue to purchase beer produced by one or both of the Defendants in the future:

Steven Edstrom, 3440 20th Street, #312, San Francisco, California 94110.

Barry Ginsburg, 7 Highgate Road, St. Louis, Missouri 63132.

Martin Ginsburg, 2033 Whitman Court, Chesterfield, Missouri 63005.

Edward Lawrence, 1905 Mar West Street, Tiburon, California 94920.

Sharon Martin, 3033 Willow Creek Estates Dr., Florissant, Missouri 63031.

Mark M. Naeger, 5914 Crane Circle, St. Louis, Missouri 63109.

John Nypl, 16325 State Highway 49, Grass Valley, California 95949.

Daniel Sayle, 12399 Maverick Dr., #E, Maryland Heights, Missouri 63043.

William Stage, 405 Shrewsbury Avenue, St. Louis, Missouri 63119.

***The Defendants***

38.     ABI is a corporation organized and existing under the laws of Belgium, with headquarters in Leuven, Belgium.  ABI is the largest brewer and marketer of beer sold in the United States.  ABI owns and operates 125 breweries worldwide, including 12 in the United States.  It owns more than 200 beer brands, including Bud Light, the number one brand in the United States, and other popular brands such as Budweiser, Busch, Michelob, Natural Light, Stella Artois, Goose Island, and Beck's.  ABI employs more than 116,000 worldwide.

39.     ABI is the resulting formation of the acquisition by InBev, the largest brewer in the world, of Anheuser-Busch, the largest brewer in the United States.  InBev and now ABI is owned and controlled by families in South America and Belgium.

*Second Amended and Supplemental Complaint*

40.     The Chief Executive Officer of ABI is Carlos Brito.  By reason of his position, Mr. Brito controls the manufacturer, distribution, and sale of beer in the United States through ABI. Mr. Brito has had and continues to have regular contact with the executives of his competitors, including the executives of MillerCoors.  Mr. Brito has enormous power and control of the beer market in the United States by reason of his history of acquisitions and elimination of competitors and potential competitors.  Indeed, it has been noted that Mr. Brito has built ABI "into a global colossus through a relentless series of takeovers."

41.     Modelo is a corporation organized and existing under the laws of Mexico, with headquarters in Mexico City, Mexico.  Modelo is the third-largest brewer of beer sold in the United States.  Modelo's Corona Extra brand is the top-selling import in the United States.  Its other popular brands sold in the United States include Corona Light, Modelo Especial, Negra Modelo, Victoria, and Pacifico.

42.     Constellation Brands, Inc. is a corporation incorporated under the laws of the State of Delaware, with its principal place of business at 207 High Point Drive, Building 100, Victor, New York 14561.  Constellation is the leading premium wine company in the United States and the world.  Constellation owns one-half of the importer of Modelo-branded beer in the United States, Crown.

43.     ABI and Modelo are owned by foreign interests.

44.     Grupo Modelo has approximately 62% of the market for production and sale of beer in Mexico.

45.     ABI currently holds a 35.3% direct interest in Modelo, and a 23.3% direct interest in Modelo's operating subsidiary Diblo, S.A. de C.V.  ABI's current part-ownership of Modelo

*Second Amended and Supplemental Complaint*

gives ABI certain minority voting rights and the right to appoint nine members of Modelo's 19-member Board of Directors.  However, as ABI stated in its most recent annual report, ABI does "not have voting and other effective control of…Grupo Modelo."

46.     ABI and Modelo executives agree that there is currently vigorous competition between the ABI and Modelo brands in the United States.  Indeed, firewalls are in place to ensure that the ABI members of Modelo's Board do not become privy to information about the pricing, marketing, or distribution of Modelo brands in the United States.  ABI's Mr. Brito intends to tear this wall down.

47.     Modelo executives run its day-to-day business, including Modelo's relationship and interaction with its U.S. importer, Crown.  Modelo owns half of Crown and may exercise an option at the end of 2013, to acquire in 2016, the half of Crown it does not already own.  Today, Modelo must approve Crown's general pricing parameters, changes in strategic direction, borrowing activities and capital investment above certain thresholds.  Modelo also sets the global strategic themes for the brands it owns.  Essentially, Crown is a group of employees who report to Crown's current owners: Modelo and Constellation.

48.     On June 28, 2012, ABI agreed to purchase the remaining equity interest from Modelo's owners, thereby obtaining full ownership and control of Modelo for about $20.1 billion.

49.     Defendants had simultaneously entered into another transaction in an attempt to "remedy" the competitive harm caused by ABI's acquisition of the remainder of Modelo:  ABI agreed to sell Modelo's existing 50% interest in Crown to Constellation, so that Crown, previously a joint-venture between Modelo and Constellation, would become wholly owned by

*Second Amended and Supplemental Complaint*

Constellation.  As part of that strategy, ABI and Constellation negotiated a supply agreement giving Constellation the exclusive right to import Modelo beer into the United States for ten years.  That agreement was revised after the DOJ filed its complaint, alleging the acquisition violates Section 7 of the Clayton Act.

50.     Under the Revised Agreement, ABI has conspired with Constellation, a company with no prior beer brewing experience, to follow ABI's price increases, to acquire the Piedras Negras brewery and the perpetual rights to the Corona and Modelo brands in the U.S. and to acquire the 50% of Crown that it does not own, all as a subterfuge to allow ABI to raise prices in the United States without any concern about Modelo's competition.  The Revised Agreement is contingent on the closing of ABI's acquisition of Modelo.  The Revised Agreement is fraudulent.

51.     After the acquisition of Modelo by ABI, for some or all of a "three-year transition" period, ABI will control and supply at least 40% of Crown's needs in the U.S. market place.

52.     ABI has the country's largest network of independent distributors/wholesalers, numbering approximately 600.  Almost all of the distributors are independent, and operate under exclusive agreements with ABI in which they agree not to deal with any products of any competitor of ABI and not to distribute any products outside of their own designated territories.

53.     ABI sells nearly 70 percent of the company's volume in the United States through wholesalers.  ABI also owns 14 company-owned distributors/wholesale operations.

54.     ABI sold 98 million barrels of beer to United States wholesalers in 2011.

55.     The most influential factor in the sale of beer in the United States is advertising.

56.     ABI is a substantial advertiser, spending more than $800 million last year alone.

*Second Amended and Supplemental Complaint*

57.     ABI was created from a series of mergers and acquisitions culminating in the merger between Anheuser Bush and InBev in 2008.  Previously in 2004, Belgium's Interbrew merged with Brazil's AmBev, creating the world's largest brewer.

58.     Prior to forming InBev in the merger of Belgium's Interbrew and Brazil's AmBev in 2004, the world's largest brewers were: (#1) Anheuser-Busch; (#2) SABMiller; (#3) Interbrew; (#4) Heineken, and (#5) AmBev.  After the combination of Interbrew and AmBev, InBev became the largest brewer in the world.

59.     When Interbrew and AmBev combined in 2004, it was then represented publicly by AmBev's CEO Carlos Brito, InBev's present CEO, that the two companies would "operate independently in different hemispheres…"  However, after the combination, Mr. Brito changed his mind and decided AmBev would expand its reach from South America into Interbrew's territories in Mexico and North America, and Interbrew would oversee operations in Europe and Asia.

60.     As the world's largest brewer, ABI has enormous economic capabilities.  ABI has 14 brands that individually generate over 1 billion per year in revenue out of a portfolio of more than 200 brands.  Total revenue in 2012 for all ABI brands was over $39 billion.

### NATURE OF TRADE AND COMMERCE

61.     Beer is comprised of a wide variety of brands and alcoholic beverages usually made from a malted cereal grain, flavored with hops, and brewed via a process of fermentation. Beer is substantially differentiated from other alcoholic beverages by taste, quality, alcohol, content, image, and price.

*Second Amended and Supplemental Complaint*

62.     In addition to brewing, beer producers typically also sell, market and develop multiple brands.  Marketing and brand building take various forms including sports sponsorships, print advertising, national television campaigns, and increasingly, online marketing.  For example, Modelo recently invested in "more national advertising [and] more national sports" in order to build the equity of [its] brands."

63.     Most brewers use distributors to merchandise, sell, and deliver beer to retailers. Those end accounts are primarily grocery stores, large retailers such as Target and Walmart, and convenience stores, liquor stores, restaurants, and bars which, in turn, sell beer to the consumer. Beer brewed in foreign countries may be sold to an importer, which then arranges for distribution to retailers.

64.     ABI groups beer into four segments: "sub-premium," "premium," "premium plus," and "high-end."  The sub-premium segment, also referred to as the value segment, generally consists of lager beers, such as Natural and Keystone branded beer, and some ales and malt liquors, which are priced lower than premium beers, made from less expensive ingredients and are generally perceived as being of lower quality than premium beers.  The premium segment generally consists of medium-priced lager beers, such as ABI's Budweiser, and the Miller and Coors brand families, including the "light" varieties.  The premium plus segment consists largely of American beers that are priced somewhat higher than premium beers, made from more expensive ingredients and are generally perceived to be of superior quality.  Examples of beers in the premium plus category include Bud Light Lime, Bud Light Platinum, Bud Light Lime-a-Rita, and Michelob Ultra.

65. The high end category includes craft beers, which are often produced in small-scale breweries, and imported beers. High-end beers sell at a wide variety of price points, most of which are higher than premium and premium plus beers. The high-end segment includes craft beers such as Dogfish Head, Flying Dog, and also imported beers, the best selling of which is Modelo's Corona. ABI also owns high-end beers including Stella Artois and Goose Island. Brewers with a broad portfolio of brands, such as ABI, seek to maintain "price gaps" between each segment. For example, premium beer is priced above the sub-premium beer, but below premium plus beer.

66. Beers compete with one another across segments. Indeed, ABI and Modelo brands are in regular competition with one another. For example, Modelo, acting through Crown in the United States, usually selects "[d]omestic premium" beer, namely, ABI's Bud Light, as its benchmark for its own brands' pricing.

67. The relevant product market is the production and sale of beer.

68. The relevant geographic market is the United States. There is competition between brewers on a national level that affects local markets throughout the United States. Decisions about beer brewing, marketing, and brand building typically take place on a national level. In addition, most beer advertising is on national television, and brewers commonly compete for national retail accounts. General pricing strategy also typically originates at a national level. A hypothetical monopolist of beer sold in the United States would likely increase its prices by at least a small but significant and non-transitory amount. Accordingly, the United States is a relevant geographic market under Section 7 of the Clayton Act.

69.     The barriers to entry to compete on a national basis are very high, including the following, among others: time and cost of building new breweries and other facilities, the time and cost of developing a network of beer distributors, the difficulty of securing shelf space in retail chains, the cost of advertising needed to secure name recognition and placement of the entrant's beer products, and the cost and time needed to build brand recognition.

70.     Neither ABI nor Modelo is a "failing company."

## ANTICOMPETITIVE EFFECTS OF THE PROPOSED ACQUISITION

71.     The United States is the world's most profitable beer market.

72.     The number of brewers operating plants in the United States has decreased markedly for decades, resulting in a highly concentrated market.

73.     The relevant market is highly concentrated and would become significantly more concentrated as a result of the proposed acquisition in that even mirror acquisitions do not exculpate the Defendants from liability.

74.     ABI is the largest brewer of beer sold in the United States.  MillerCoors is the second-largest brewer of beer sold in the United States.  MillerCoors owns the Miller and Coors brands and also many smaller brands including Blue Moon and Keystone Light.  Modelo is the third-largest brewer of beer sold in the United States, with annual U.S. sales of $2.47 billion, 5% market share nationally, and a market share that is nearly 20% in some local markets.  Modelo owns the Corona, Modelo, Pacifico, and Victoria brands.  The remaining sales of beer in the United States are divided among Heineken and fringe competitors, including many craft brewers, which Defendants characterize as being "fragmented…small player[s]."

75.     ABI dominates the production and sale of beer in the United States.

*Second Amended and Supplemental Complaint*

76.    ABI has 49% of the beer market in the United States.

77.    MillerCoors has 30% of the beer market in the United States.

78.    Modelo has 5% of the beer market in the United States.

79.    Heineken has 4% of the beer market in the United States.

80.    The remaining producers of beer including craft beer and micro brewers have 12% of the beer market in the United States.

81.    In the United States, the Defendants will have control over a combined market share of approximately 55% post-transaction.

82.    The market concentration and control measures described above, demonstrate that the acquisition is presumed to be anticompetitive.

83.    Price is the most important consideration in the sale of beer.  Indeed, ABI and MillerCoors consider beer to be a commodity and that the only competition between them is with regard to advertising.

84.    Shelf space in major retail chains and other retail outlets is an important part in the sale of beer.  The person in charge is usually referred to as the "Category Captain" who determines which beer will be placed on which part of the shelves of the store.  These Category Captains are induced, coerced, and given gratuities in order to give ABI and MillerCoors the best possible position on the shelf.

85.    ABI and MillerCoors typically announce annual price increases in late summer for execution in early fall.  The increases vary by region, but typically cover a broad range of beer brands and packs.  In most local markets, ABI is the market share leader and issues its price announcement first, purposely making its price increases transparent to the market so its

*Second Amended and Supplemental Complaint*

competitors will get in line.  In the past several years, MillerCoors has followed ABI's price increases almost always, and sometimes MillerCoors would take the lead and ABI follow, however, Modelo had other plans and became a significant competitive impediment to ABI's march toward higher prices and less quality.

86.     The specifics of ABI's pricing strategy are governed by its "Conduct Plan," a strategic plan for pricing in the United States that reads like a how-to manual for successful price coordination.  The goals of the Conduct Plan include: "yielding the highest level of followership in the short-term" and "improving competitor conduct over the long-term."

87.     ABI's Conduct Plan emphasizes the importance of being "Transparent – so competitors can clearly see the plan."  According to ABI, its Conduct Plan "increases the probability of [ABI] sustaining a price increase."

88.     In the past several years, Modelo, acting through Crown, has disrupted ABI's pricing strategy by declining to match many of the price increases that were led by ABI and frequently joined by MillerCoors.

89.     In or around 2008, Crown implemented its "Momentum Plan" with Modelo's enthusiastic support.  The Momentum Plan is specifically designed to grow Modelo's market share by shrinking the price gaps between brands owned by Modelo and domestic premium brands.  By maintaining steady pricing while the prices of premium beer continues to rise, Modelo has narrowed the price gap between its beers and ABI's premium beers, encouraging consumers to trade up to Modelo brands.  These narrowed price gaps frustrate ABI and MillerCoors because they result in Modelo gaining market share at their expense.

90.     ABI is intent on moderating price competition. As it has explained internally: "We must defend from value-destroying pricing by: [1] Ensuring competition does not believe they can take share through pricing[,] [and] [2] Building discipline in our teams to prevent unintended initiation or acceleration of value-destroying actions."  In general, ABI, as the price leader, would prefer a market not characterized by aggressive pricing actions to take share because "[t]aking market share this way is unsustainable and results in lower total industry profitability which damages all players long-term."

91.     A price war among the biggest brewers had led ABI to complain in internal documents that Modelo's strategy was "eating Anheuser's lunch."

92.     Competition spurred by Modelo has benefitted consumers through lower beer prices, better quality, and increased innovation.  It has also thwarted ABI's vision of leading industry prices upward with MillerCoors and others following.

93.     The competitive threat to ABI is threefold: (1) ABI cannot raise its prices at will to the height it wants; (2) The narrowing of price differential between ABI's lesser-quality beers and Modelo's higher-quality beers increases the likelihood of consumers trading up; and (3) The narrowing price differential requires ABI to either lower prices or improve the quality of its beers so that ABI can discourage consumers from trading up to better beers.

94.     Constellation has not shared Crown and Modelo's willingness to thwart ABI's price leadership. In June 2012, a Crown executive stated that Constellation's plan for annual price increases "put at risk the relative success" of the Momentum plan.

95.     To win antitrust approval, as part of ABI's acquisition of the 50% of Grupo Modelo that it does not already own, ABI has entered into a Revised Agreement to sell the

*Second Amended and Supplemental Complaint*

brewery Compani Cervecera de Coahuila in Piedras Negras, Mexico and to grant perpetual licenses for Corona and Modelo brands to Constellation for $2.5 billion. Constellation will acquire the 50% of Crown it does not own for $1.85 billion.

96.     Under the Revised Agreement, ABI and Constellation have also agreed to a three-year transition services agreement. During this three year period, ABI will control approximately 40% of Crown's needs in the U.S. market place. The Piedras Negras brewery, as is, is equipped to fulfill only 60% of Crown's demand in the U.S.

97.     Moreover, during the three year transition, ABI's control of the new brewery is demonstrated by its supply of aluminum cans, glass, malt, yeast, corn starch, logistics, material resource planning, general administrative services, management and other key inputs. In short, the brewery, and therefore Crown, will be controlled *de facto* by ABI with Constellation as its cover.

98.     Constellation has conspired with ABI, the terms of which include those in the Revised Agreement and Constellation's agreement to follow ABI's price leads.

99.     Post-transaction, Constellation will no longer be constrained by Crown and Modelo. Even if Crown's own executives wanted to continue an aggressive pricing strategy, they would be required to answer to Crown's new sole owner-Constellation.

100.    Crown executives were concerned about what would happen if Constellation gained complete control of Crown. Crown's CEO wrote to Constellation's CEO after Defendants' proposed "remedy" was announced: "the Crown team [] is extremely anxious about this change in ownership. This is in no small part the result of Constellation's actions over the term of the joint venture to limit investment in the business in the areas of manpower and marketing."

Constellation's CEO responded internally: "[Q]uite something.  I see a management issue brewing."  In another email, Crown's CEO wrote to his employees that Constellation had been "consistently non supportive of the business through Crown's history…seeking to drive profits at all costs."

101.    The Revised Agreement is fraudulent.

102.    Constellation is not and has never been a significant or national brewer of beer.

103.    Constellation does not have the financial wherewithal to purchase the Piedras Negras brewery, the perpetual licenses for the Corona and Modelo brands in the U.S., and to acquire the 50% of Crown it does not already own, without substantially adding to its already significant debt and poor credit rating.

104.    If the proposed acquisition proceeds, ABI will aid Constellation in funding, either directly or indirectly.

105.    If the proposed acquisition is permitted, ABI and Constellation will immediately raise beer prices.  Constellation would no longer need to ask Modelo for permission to follow ABI's price leadership.  Constellation would be free to follow ABI's lead.  ABI and Constellation will have every incentive to act together on pricing because of the vast profits each would stand to make if beer prices were to increase.

106.    The three-year transition services agreement and the supply relationship between ABI and Constellation would also facilitate price fixing between the two companies.  Post-acquisition, there would be day-to-day interaction between ABI and Constellation, providing countless opportunities to control prices and eliminate competition.

*Second Amended and Supplemental Complaint*

107.   The proposed acquisition will increase the ability of ABI and the remaining beer firms to coordinate.  Grupo Modelo inhibited ABI's price leadership.  Constellation, who will acquire perpetual rights for Corona and the Modelo brands in the U.S. under the revised agreement has demonstrated a willingness to follow ABI's price increases.  Moreover, ABI will remain in control of 40% of Crown's needs for the U.S. marketplace, for some or all of the three-year transition period, allowing it to immediately institute price increases.

108.   Price fixing is a *per se* violation of the Sherman Act.  There is a substantial threat that if ABI is allowed to buy Modelo and then spinoff its interest in Crown to Constellation, and then have Constellation buy a multi-billion dollar brewery (its first ever) which will be supplied and run by ABI for the first three years, Constellation will eagerly and tacitly agree with ABI to raise and follow ABI's price increases.  Constellation is not a beer brewer.  Constellation had no interest in buying the Piedras Negras brewery.  Constellation could not and cannot afford to buy the brewery and did not want to do so until Carlos Brito of ABI enticed Constellation to do so.  Constellation, a half owner of Crown, constantly and consistently urged Crown to abandon Crown's competitive plan and raise prices with ABI.  Crown continued to refuse.  An antagonism developed between Crown's executive and Constellation's executive because of the disagreement over Crown's hugely successful competitive plan-The Momentum Plan.  Among other things, if ABI is allowed to go forward with its purchase of Modelo and execute its Machiavellian plan with Constellation, Crown's executive will be fired, prices will rise with ABI, and Modelo's competitive plan will be eliminated and abandoned.

109.   Even if Constellation wanted to sell at odds with ABI post-transaction, it would be unlikely and unable to do so.  Crown will be dependent on ABI for at least 40% of its supply

*Second Amended and Supplemental Complaint*

and will be controlled by ABI during the term of the three-year transition services agreement. Therefore, it would not have any independence in order to refuse to increase prices when ABI does.

110.    ABI and Modelo are substantial and significant potential competitors in the United States.

111.    The production and sale of beer are in a continuous and uninterrupted flow of interstate and foreign commerce.  Materials used in the production of beer are purchased and shipped in a continuous and uninterrupted flow of interstate and foreign commerce.

112.    National brewers possess significant competitive advantages over smaller or regional brewers.  They are able to advertise on a nationwide basis, have greater prestige, larger distribution networks, and are less affected by weather and labor issues.

113.    Any restraint of trade in the beer sales market in the United States, including the restraints specifically alleged in this Complaint, directly and substantially restrains and affects interstate and foreign commerce.

114.    Any agreement short of prohibiting the acquisition will result in breaking through the price ceiling established by Modelo and immediately give an opening for across-the-board price increases.

115.    As the foregoing paragraphs show, the effect of the acquisition, if consummated, may be substantially to lessen competition, or tend to create a monopoly in the production and, sale of beer in the United States by eliminating Modelo as an actual or potential competitor and giving the new company monopoly power and the likelihood of collusion.

*Second Amended and Supplemental Complaint*

116.    By reason of the proposed acquisition, consumer choice and consumer welfare will be eliminated.

117.    By reason of the ABI's proposed acquisition, Plaintiffs are significantly threatened with loss or damage in the form of higher beer prices, lesser quality, and diminished competitive options.  If ABI's acquisition is consummated, Plaintiffs will sustain irreparable harm for which damages will be unable to compensate Plaintiffs, in that competition in quality, innovation, choice, as well as price, once lost cannot easily be restored. Accordingly, Plaintiffs bring this action for both preliminary and permanent injunctive relief against the ABI acquisition.

## VIOLATIONS ALLEGED

### Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, and Section 1 of the Sherman Act 15 U.S.C. § 1, and, in the Alternative, State Statutes Prohibiting Price-Fixing and Allowing Suit by Direct and Indirect Purchasers

118.    Plaintiffs incorporate and reallege paragraphs 1 through 117 above.

119.    The conduct of ABI and Modelo described hereinabove, specifically the agreement to allow ABI to purchase Modelo, constitutes a violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, in that the effect of the proposed acquisition may be substantially to lessen competition, or to tend to create a monopoly in the production and sale of beer in the United States; and that there is a significant threat that ABI and Constellation will fix prices in that Constellation will follow ABI price increases by agreement and understanding.  By reason of these violations Plaintiffs are threatened with loss or damage in the form of higher beer prices, diminished competition, lack of consumer choice, and innovation, as well as irreparable harm for which damages will be inadequate to compensate Plaintiffs, such that Plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary

28

*Second Amended and Supplemental Complaint*

and permanent injunctive relief to prohibit the Defendants' acquisition and price fixing, and to recover their costs of suit, including a reasonable attorney's fee.

120. Unless restrained and enjoined, ABI will consummate the acquisition of Modelo to the immediate and irreparable damage of the Plaintiffs and the consuming public in that assets and personnel will be commingled and Defendants will immediately institute substantial price increases.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand the following relief from this Honorable Court:

A. Declaring, finding, adjudging, and decreeing that the agreement between ABI and Modelo proposing that ABI purchase Modelo violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.

B. Preliminarily and permanently enjoining Defendants from consummating their acquisition during the pendency of this action.

C. Preliminarily and permanently enjoining Defendants from consummating their acquisition.

D. Awarding to Plaintiffs their costs of suit, including a reasonable attorney's fee, as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

E. Granting to Plaintiffs such other and further relief to which they may be entitled and which the Court finds to be just and appropriate.

## **SUPPLEMENTAL COMPLAINT**

1. Plaintiffs file this, their Supplemental Complaint pursuant to Fed. R. Civ. P. 15, to encompass events that have occurred since the filing of their Complaint and First Amended

*Second Amended and Supplemental Complaint*

Complaint.

2.     Plaintiffs reallege paragraphs 1 through 117 of the Second Amended Complaint above as if alleged at length herein.

3.     Since the filing of the Complaint and First Amended Complaint, the defendants have taken action to consummate their merger.

4.     At the time the defendants took such action, there was – and continues to be – pending in the United States District Court for the District of Columbia, civil action number 1:13-cv-00127, an action styled *United States of America v. Anheuser-Busch InBEV SA/NV, et al.*, ("the Government's Action") in which the United States seeks to prevent the merger because, according to the government's complaint, "[t]he transaction that is the subject of this Complaint threatens competition by combining the largest and third-largest brewers of beer sold in the United States" and the government "seeks to enjoin this acquisition and prevent a serious violation of Section 7 of the Clayton Act."

5.     The government and the defendants in the Government Action have reached a preliminary agreement to settle that action by entering into a consent judgment and notice of same has been given in accordance with the requirements of the Tunney Act (15 U.S.C. § 16), which provides, *inter alia*, for a period of 60 days within which the public may file comments with respect to the proposal for a consent judgment, including any objections thereto.

6.     The requirements of the Tunney Act must be fully complied with before the consent judgment may become final and effective and the defendants permitted to consummate their merger.

*Second Amended and Supplemental Complaint*

7.     The Tunney Act's requirements have not been met, the 60 day comment period will not even expire until July 21, 2013, and a consent judgment has not been entered. Nonetheless, the defendants have taken steps to consummate the merger, and combined and commenced operations in violation of the Tunney Act.

8.     The actions alleged to have been committed by the defendants in the Second Amended Complaint and in this Supplemental Complaint are forbidden by the antitrust laws of the United States and as a result thereof plaintiffs have been and will continue to be injured in their business or property.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand the following relief from this Honorable Court:

A.     Declaring, finding, adjudging, and decreeing that the agreement, including the proposed consent judgment, of the defendants to merge violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.

B.     A final judgment of divestiture requiring defendants to unwind their merger and permanently enjoining them from merging in the future.

C.     A preliminary injunction requiring during the pendency of this action that the defendants hold separate and not commingle their businesses that have been combined pursuant to their merger, so that divestiture may be expeditiously and effectively accomplished following trial on the merits and judgment in plaintiffs' favor.

D.     In the event the merger is finally consummated, judgment awarding plaintiffs such damages, trebled, as provided by Section 4 of the Clayton Antritrust Act (15 U.S.C. § 15) and/or

*Second Amended and Supplemental Complaint*

any State statutes allowing suit by both direct and indirect purchasers as they show themselves to

have sustained during the pendency of defendants' merger prior to an order of divestiture.

       E.       Awarding to plaintiffs their costs of suit, including a reasonable attorney's fee,

as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

       F.       Granting to plaintiffs such other and further relief to which they may be entitled

and which the Court finds to be just and appropriate.

## JURY TRIAL DEMANDED

       Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs Demand a trial by jury of all claims asserted

in this, their Second Amended Complaint and Supplemental Complaint so triable.

Dated: June 25, 2013                **ALIOTO LAW FIRM**

                          By:    /s/ Joseph M. Alioto
                                 Joseph M. Alioto
                                 Theresa D. Moore
                                 Thomas P. Pier
                                 Jamie L. Miller
                                 **ALIOTO LAW FIRM**
                                 One Sansome Street, 35th Floor
                                 San Francisco, CA 94104
                                 Telephone: (415) 434-8900
                                 Facsimile: (415) 434-9200
                                 Email: jmalioto@aliotolaw.com

## PLAINTIFFS' COUNSEL

Joseph M. Alioto (SBN 42680)            Jeffery K. Perkins
Theresa D. Moore (SBN 99978)          **LAW OFFICES OF JEFFERY K.**
Thomas P. Pier (SBN 235740)           **PERKINS**
Jamie L. Miller (SBN 271452)           1550-G Tiburon Boulevard, #344
**ALIOTO LAW FIRM**                   Tiburon, CA 94920
One Sansome Street, 35th Floor         Telephone: (415) 302-1115
San Francisco, CA 94104               Facsimile: (415) 435-4053
Telephone: (415) 434-8900           jefferykperkins@aol.com
Facsimile: (415) 434-9200
Email: jmalioto@aliotolaw.com

*Second Amended and Supplemental Complaint*

Theodore F. Schwartz (SBN 58946)
Kenneth R. Schwartz
*Admitted Pro Hac Vice*
**Law Offices of Theodore F. Schwartz**
7751 Carondelet, Ste. 204
Clayton, MO 63105
Telephone: (314) 863-4654
Facsimile: (314) 862-4357
Email: Theodore@schwartz-schwarta.com

Gil D. Messina
Timothy A. C. May
*Admitted Pro Hac Vice*
**MESSINA LAW FIRM, P.C.**
961 Holmdel Road
Holmdel, NJ 07733
Telephone: (732) 332-9300
Facsimile: (732) 332-9301
Email: gmessina@messinalawfirm.com
Email: tmay@messinalawfirm.com

Jack Lee (SBN 71616)
Derek Howard (SBN 118082)
Sean Tamura-Sato (SBN 254092)
**MINAMI TAMAKI LLP**
360 Post St., 8th Floor
San Francisco, CA 94108
Telephone: (415) 788-9000
Facsimile: (415) 398-3887
Email: jlee@minamitamaki.com
         dhoward@minamitamaki.com
         seant@minamitamaki.com

Peter C. Sullivan
*Admitted Pro Hac Vice*
7751 Carondelet, Ste. 204
Clayton, MO 63105
Telephone: (314) 863-4654
Facsimile: (314) 862-4357
Email: peter@petercsullivan.com

John H. Boone (SBN 44876)
**LAW OFFICES OF JOHN H. BOONE**
4319 Sequoia Drive
Oakley, CA 94561
Telephone: (415) 317-3001
Facsimile: (415) 434-9200