1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STEVEN EDSTROM, et al.,

        Plaintiffs,

   v.

ANHEUSER-BUSCH InBEV SA/NV, et al.,

        Defendants.

/

No. C 13-1309 MMC

**ORDER GRANTING DEFENDANTS'
MOTIONS TO DISMISS; DENYING
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

Before the Court are two motions to dismiss plaintiffs' Second Amended Complaint,

each filed June 28, 2013, by, respectively, defendants Anheuser-Busch InBev SA/NV

("ABI") and Constellation Brands, Inc. ("Constellation"); also before the Court is a motion for

preliminary injunction, filed June 28, 2013 by plaintiffs.  The motions came on regularly for

hearing August 9, 2013.  Joseph M. Alioto, Sr. of the Alioto Law Firm appeared on behalf of

plaintiffs.  Steven C. Sunshine of Skadden Arps Slate Meagher and Flom LLP appeared on

behalf of ABI.  Raymond A. Jacobsen, Jr. of McDermott Will Emery LLP appeared on

behalf of Constellation.  Having read and considered the parties' respective written

submissions, including the parties' supplemental briefing, and having considered the

arguments of counsel, the Court rules as follows.

## BACKGROUND

ABI, "controls approximately 50% of the manufacture, distribution, and sale of beer

in the United States."  (See Second Amended Complaint ("SAC") ¶ 1.)  Prior to any of the

transactions discussed below, ABI owned a fifty-percent interest in Grupo Modelo S.A.B.

de C.V. ("Grupo Modelo"), "the largest brewer in Mexico." (See SAC ¶¶ 3, 94.)[1]  In 2012, ABI "agreed to purchase the remaining equity interest from [Grupo] Modelo's owners, thereby obtaining full ownership and control of [Grupo] Modelo." (See SAC ¶ 48.)  At that time, Grupo Modelo imported its beer into the United States through Crown, "an importer, distributor and wholesaler, owned 50% by [Grupo] Modelo and 50% by Constellation." (SAC ¶ 3.)  Under the terms of the proposed acquisition, ABI would acquire Grupo Modelo, and Constellation would acquire the remainder of Crown and would receive an exclusive license to import into the United States Grupo Modelo beer, which license could not be revoked for ten years. (See SAC ¶ 27.)  After the ten-year period expired, ABI would have the unilateral ability to terminate Constellation and Crown's licensing rights. (See SAC ¶ 27.)

In January 2013, the Department of Justice ("DOJ") filed suit in the District Court for the District of Columbia ("D.C. Court"), alleging the proposed acquisition violated § 7 of the Clayton Act. (See SAC ¶¶ 28, 49.)  In response to the DOJ's suit, ABI and Grupo Modelo proposed a different set of transactions.  The agreements governing those transactions again provided for ABI's acquisition of Grupo Modelo and Constellation's acquisition of Crown, but, in contrast to the earlier proposal, Constellation would acquire an irrevocable exclusive license to import Grupo Modelo brands into the United States, and, in addition, Grupo Modelo's Piedras Negras brewery, enabling Constellation itself to brew Grupo Modelo branded beers.  (See SAC ¶ 29.)

The proposed revisions alleviated the DOJ's concerns, and, on April 19, 2013, the DOJ, ABI, Grupo Modelo, and Constellation filed, in the D.C. Court, a Proposed Final Judgment (see Lent Decl. Ex. 3), which filing outlined the revised transactions discussed above and incorporated the related agreements, which set out fully the details of the those transactions.  On April 22, 2013, the D.C. Court filed a Stipulation and Order, which, inter

---

[1] "[Grupo] Modelo has approximately 5% of the [beer] market in the United States" (see SAC ¶ 3), but "approximately 62% of the market for production and sale of beer in Mexico" (see SAC ¶ 44).

1  alia, permitted defendants to move forward with the proposed transactions pending entry of

2  a final judgment. (Lent Decl. Ex. 5).[2]  During the pendency of the case before the D.C.

3  Court, no preliminary injunction to halt the transactions was sought or entered.  See United

4  States v. Anheuser-Busch InBev SA/NV, No. 13-127 (D.D.C. filed Jan. 31, 2013).

5       On March 22, 2013, before the proposed transactions were completed, plaintiffs,

6  who are consumers and purchasers of beer in the United States, filed the above-titled

7  action, alleging violations of the Clayton and Sherman Acts.  After the lawsuit was filed,

8  defendants completed the proposed transactions.  (See SAC at 30:5-6.)[3]  Plaintiffs have

9  twice amended their complaint, once before and once after defendants' completion of the

10  transactions.  In their Second Amended Complaint, the operative pleading, plaintiffs assert

11  the following claims:  (1) violation of the Clayton Act, 15 U.S.C. § 18; (2) violation of the

12  Sherman Act, 15 U.S.C. § 1; (3) violation of the Tunney Act, 15 U.S.C. § 16; and

13  (4) violations of unspecified state laws.

14                              **LEGAL STANDARD**

15       Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure can be based

16  on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

17  cognizable legal theory.  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.

18  1990).  Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim

19  showing that the pleader is entitled to relief.'"  See Bell Atlantic Corp. v. Twombly, 550 U.S.

20  544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  Consequently, "a complaint attacked by

21  a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."  See id.

22  Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief

23  requires more than labels and conclusions, and a formulaic recitation of the elements of a

24  cause of action will not do."  See id. (internal quotation, citation, and alteration omitted).

25

26       [2] To date, the D.C. Court has not entered final judgment.

27       [3] On June 3, 2013, plaintiffs, seeking to halt the merger, moved for a temporary
    restraining order.  After a hearing held on June 4, 2013, the Court denied the motion.  (See
28  Order, filed June 5, 2013.)

1   "To survive a motion to dismiss, a complaint must contain sufficient factual material,

2   accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>,

3   556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570).  "Factual allegations must

4   be enough to raise a right to relief above the speculative level[.]"  <u>Twombly</u>, 550 U.S. at

5   555.  In analyzing a motion to dismiss, a district court must accept as true all material

6   allegations in the complaint, and construe them in the light most favorable to the

7   nonmoving party.  <u>See</u> <u>NL Industries, Inc. v. Kaplan</u>, 792 F.2d 896, 898 (9th Cir. 1986).

8   Courts "are not bound," however, "to accept as true a legal conclusion couched as a factual

9   allegation."  <u>See</u> <u>Iqbal</u>, 556 U.S. at 678 (internal quotation and citation omitted).

10   Generally, a district court, in ruling on a Rule 12(b)(6) motion, may not consider any

11   material beyond the complaint.  <u>See</u> <u>Hal Roach Studios, Inc. v. Richard Feiner & Co.</u>, 896

12   F.2d 1542, 1555 n. 19 (9th Cir. 1990).  Documents whose contents are alleged in the

13   complaint, and whose authenticity no party questions, but which are not physically attached

14   to the pleading, however, may be considered.  <u>See</u> <u>Branch v. Tunnell</u>, 14 F.3d 449, 454

15   (9th Cir. 1994).  In addition, a district court may consider any document "the authenticity of

16   which is not contested, and upon which the plaintiff's complaint necessarily relies,"

17   regardless of whether the document is referenced in the complaint.  <u>See</u> <u>Parrino v. FHP,</u>

18   <u>Inc.</u>, 146 F.3d 699, 706 (9th Cir. 1998).  Finally, the Court may consider matters that are

19   subject to judicial notice, <u>see</u> <u>Mack v. South Bay Beer Distributors, Inc.</u>, 798 F.2d 1279,

20   1282 (9th Cir. 1986), such as "court filings and other matters of public record," <u>see</u> <u>Reyn's</u>

21   <u>Pasta Bella, LLC v. Visa USA, Inc.</u>, 442 F.3d 741, 746 (9th Cir. 2006).[4]

22   **DISCUSSION**

23   **A. MOTIONS TO DISMISS**

24   Defendants move to dismiss the claims brought in the SAC for failure to allege

25   sufficient facts to support a cognizable legal theory.  The Court addresses each alleged

26   _____

27   [4] Defendants request the Court take judicial notice of the revised agreements.  As
the contents of the documents are alleged in the complaint and their authenticity is not
28   challenged, defendants' request is hereby GRANTED.

claim in turn.

**1. Clayton Act**

Plaintiffs allege they will be harmed by ABI's acquisition of Grupo Modelo because, according to plaintiffs, ABI wishes to raise the prices of its beer and has been prevented from doing so by Grupo Modelo's past unwillingness to raise prices.  (See Compl. ¶¶ 6-8.) Plaintiffs further allege the result of the above-described revised agreements is that Constellation will be ABI's "puppet" and will raise prices according to ABI's wishes, thus eliminating the "competitive constraint on ABI's . . . ability to raise prices."  (See Compl. ¶ 20.)

Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits the acquisition of stocks or assets if the effect of such acquisition "may be substantially to lessen competition, or to tend to create a monopoly."  See 15 U.S.C. § 18.  To establish a § 7 violation, a party "must show that the merger would produce 'a firm controlling an undue percentage share of the relevant market, and would result in a significant increase in the concentration of firms in that market.'"  See F.T.C. v. H.J. Heinz Co., 246 F.3d 708, 715 (D.C. Cir. 2001) (alterations omitted) (quoting United States v. Philadelphia Nat. Bank, 374 U.S. 321, 363 (1963)).

As discussed above, the revised agreements providing for ABI's acquisition of Grupo Modelo do not permit ABI to sell Grupo Modelo beer in the United States.  Consequently, as provided therein, ABI's percentage share of the United States market will not be increased as a result of the merger.  Plaintiffs allege, however, that the revised agreements are "fraudulent," and that the agreements are structured in such a way that ABI will be in a position of power over Constellation, will effectively run the Piedras Negras brewery, and will control Constellation's pricing and supply decisions in the United States.  (See SAC ¶ 30.)

After considering plaintiffs' allegations and the sections of the revised agreements cited in support thereof, the Court, as discussed below, finds plaintiffs' contentions unpersuasive.

1

### a. **Employment**

2   Plaintiffs allege ABI will employ and compensate the 600 employees working at the

3   Piedras Negras brewery (see Compl. ¶ 30), and argue ABI thus will be in control of

4   operations at the brewery.  In support of such argument, plaintiffs rely on §§ 2.01 and 3.01

5   of the Transition Services Agreement.  Those sections, however, cover the services

6   Constellation is entitled to contract for and receive from ABI during the period it transitions

7   into running the brewery and during its expansion of the brewery, specifically, consultation

8   and ancillary administrative services, which services are not performed by the workers

9   running the brewery.  (See Lent Decl. Ex. 4, Transition Services Agreement ("TSA")

10  § 2.01(a)-(d); Doc. No. 118, TSA Schedule 2.01(d).)  Moreover, ABI is required to provide

11  such services to Constellation only at Constellation's request (see id. at § 2.01) and at

12  prices set in the Transition Services Agreement (see Doc. No. 118, TSA Schedule

13  3.02(a)(ii));[5] there is nothing in the terms of the agreement to prevent Constellation, if it

14  chooses, from procuring such services elsewhere.

15  As to the 600 workers employed at the Piedras Negras brewery to which plaintiffs

16  refer, those workers, pursuant to the terms of the revised agreements, are employed by

17  Servicios Modelo de Coahuila, S.A. de C.V. ("SMC"), a company that, as part of the revised

18  agreements, Constellation purchased.  (See Lent Decl. Ex. 4, Stock Purchase Agreement

19  ("SPA") § 1.1.)  Sections 2.01 and 3.01 of the Transition Services Agreement are in no

20  manner applicable to those workers.  Additionally, the Transition Services Agreement

21  expressly provides the following:  "Notwithstanding anything to the contrary, under no

22  circumstances shall [ABI] have the authority to make any decisions with respect to the

23  operation and expansion of the Piedras Negras Plant or [SMC]."  (See Lent Decl. Ex. 4,

24  TSA § 2.01.)

25  _____

26  [5] Defendants originally filed with this Court redacted versions of the revised
    agreements.  At the hearing, plaintiffs expressed concern that the prices to be paid by
27  Constellation for the above-referenced services had been redacted.  After the hearing,
    defendants filed, under seal, unredacted versions of the redacted documents, and the
28  parties were afforded an opportunity to file supplemental briefing based thereon.  (See
    Order, filed Aug. 21, 2013.)

### b. Sub-License

As part of the transaction, Constellation received from Marcas Modelo, a subsidiary of Grupo Modelo, "an irrevocable, exclusive, fully paid-up, sub-license to use the Trademarks" in connection with importing, distributing, promoting, and selling Grupo Modelo products in the United States.  (See Lent Decl., Ex. 4, Amended and Restated Sub-License Agreement ("SLA") § 2.1(a).)  Marcas Modelo warrants that it has "full authority and right to grant the sub-licenses to Constellation." (See id.)  ABI guarantees Marcas Modelo's performance under the Sub-License Agreement.  (See Lent Decl., Ex. 4, Amended and Restated Membership Interest Purchase Agreement § 6.1).  Plaintiffs argue Constellation may be able to assign the sub-license to ABI.  Under the revised agreements, however, ABI is prohibited from reacquiring such rights for a period of ten years.  (See Lent Decl. Ex. 3, Proposed Final Judgment ("PFJ") § XV.)  After such ten-year period, as defendants point out, were ABI to attempt to purchase from Constellation its licensing rights, such acquisition would be subject to antitrust challenge.

### c. Distributors

Plaintiffs allege ABI owns fourteen distributors possessing rights to distribute Grupo Modelo beer in the United States.  (See SAC ¶ 53.)  Under the revised agreements, such ABI-owned distributors are permitted to continue to distribute Grupo Modelo beers produced and imported by Constellation.  Plaintiffs argue the ABI-owned distributors could raise the prices of the Grupo Modelo beers imported by Constellation.  Even if plaintiffs are correct, such circumstances are not attributable to the merger.  ABI-owned distributors were free to raise prices before ABI's acquisition of Grupo Modelo.  Further, under the revised agreements, Constellation now has the right to direct any ABI-owned distributor to sell its distribution rights to another distributor.  (See Lent Decl. Ex. 3, PFJ §§ II.B, V.C.)

### d. Firewalls

Plaintiffs argue the firewall provisions contained in the revised agreements are illusory and that such agreements allow for the sharing of confidential information between ABI and Constellation.  The firewall provisions to which plaintiffs refer are contained in the

7

1    Transition Services Agreement (see Lent Decl., Ex. 4, TSA § 2.12), the Interim Supply

2    Agreement (see Lent Decl., Ex. 4, Interim Supply Agreement ("ISA") § 5.4), and the

3    Proposed Final Judgment (see Lent Decl., Ex. 3, PFJ § XIII).  The Transition Services

4    Agreement provides that each of the parties thereto shall use the confidential information of

5    the other "only for the purposes of fulfilling its obligations under [the Transaction Services]

6    Agreement" (see Lent Decl. Ex. 4, TSA § 2.12(a)), that information "relating to pricing or

7    sales is competitively sensitive," and that ABI shall not disclose such information to

8    employees with "direct responsibility for marketing, distributing or selling beer" (see id.

9    § 2.12(d)).  The Interim Supply Agreement likewise prevents each of the parties thereto

10   from using the other party's confidential information "for any purpose other than in

11   connection with the performance of the obligations and exercise and enforcement of the

12   rights" of said parties thereunder.  (See Lent Decl. Ex. 4, ISA §§ 5.4 & 5.5.)  The Interim

13   Supply Agreement further prevents the disclosure of pricing or sales information to any of

14   Grupo Modelo and ABI's employees who have direct responsibility for marketing,

15   distributing, or selling beer.  (See id., ISA § 5.6.)  Additionally, the Proposed Final

16   Judgment prohibits ABI from disclosing Constellation's confidential information to any of

17   ABI's "affiliates who are involved in the marketing, distribution or sale of [b]eer in the United

18   States." (See Lent Decl. Ex. 3, PFJ § XIII.)  Plaintiffs fail to allege any facts to show such

19   protections are inadequate.

20          **e.  Supply of Products and Beer**

21          Under the revised agreements, ABI, for a period of three years, is required to supply

22   Constellation with the raw materials and supplies needed to brew beer at the Piedras

23   Negras brewery.  (See Lent Decl. Ex. 4, TSA §§ 2.01(e), 2.04(e).)  Additionally, as the

24   Piedras Negras brewery currently lacks the capacity to brew sufficient quantities to meet

25   the demand for Grupo Modelo beers in the United States, the revised agreements further

26   require ABI to supply Constellation with enough Grupo Modelo beers to cover demand

27   during Constellation's expansion of the brewery.  (See Lent Decl. Ex. 4, ISA § 2.1.)

28          Under such terms, plaintiffs argue, either Constellation, to curry favor with ABI, will

8

raise the prices of Grupo Modelo beers sold in the United States, or ABI will set the prices for the raw materials and beers it provides to Constellation so high that Constellation will have no choice but to raise the prices of the beer it sells in the United States.  The prices for the raw materials and beers to be provided by ABI, however, are governed by the revised agreements and cannot be altered by either party.  (See Lent Decl. Ex. 4, TSA § 3.02(a)(i); Doc. No. 118, TSA Schedule 3.02(a)(i) (setting forth formulas for price of supplies); id. at ISA § 3.1 (setting forth formulas for price of Grupo Modelo beers supplied to Constellation).)

At the hearing, plaintiffs, for the first time, raised concerns as to § 2.9(c) of the Interim Supply Agreement, under which ABI, upon notice to Constellation, is permitted to discontinue any Grupo Modelo product if such product is no longer sold in Mexico and if the sales of such product in the United States are minimal.  (See Lent Decl. Ex. 4, ISA § 2.9(c).)  Plaintiffs contend § 2.9(c) prohibits Constellation from creating new products. Plaintiffs' argument is not supported by the record.  The cited section is contained in the Interim Supply Agreement, which document governs the supply to Constellation of Grupo Modelo beers produced in ABI-owned breweries; it does not prevent Constellation from creating and/or producing any beer it chooses to brew.  Rather, it serves to protect Constellation's interests by prohibiting ABI from unilaterally discontinuing any product on the basis of its lack of popularity outside the United States.

### f.  Innovation

Plaintiffs argue the revised agreements "den[y] Constellation the benefit of any product or production innovations that would otherwise become available to it during the period that ABI's employees continue to operate the Piedras Negras brewery."  (See Opp'n at 19:2-4.)  Again, plaintiffs' argument is not supported by the record.  First, as discussed above, ABI's employees will not operate the brewery.  Second, although the transitional services provided by ABI to Constellation do not include consulting as to innovation (see Lent Decl. Ex. 4, TSA § 2.01), Constellation has access to and may, at no cost, adopt any Grupo Modelo recipe changes made by ABI (see Lent Decl. Ex. 4, SLA § 2.2).

### g.  Expansion into Mexico

Plaintiffs argue Constellation's expansion into Mexico with non-Grupo Modelo products it might, in the future, choose to produce is "subject to . . . ABI's veto."  (See Opp'n at 17:14; see also Lent Decl. Ex. 4, SPA § 5.7).  Plaintiffs' reliance on § 5.7 is misplaced.  At the outset, defendants, noting § 5.7 provides for a "Right of First Offer" (see SPA § 5.7), dispute plaintiffs characterization of said section as a veto.  More importantly, defendants also point out § 5.7 was subsequently eliminated by amendment and is not part of the revised agreements.  (See Lent Decl. Ex. 4, First Amendment to SPA ¶ 5.)

In sum, neither plaintiffs' allegations, nor the revised agreements on which they rely, show ABI's acquisition of Grupo Modelo will result in ABI's control of Constellation or otherwise increase its percentage share of the beer market in the United States.

Accordingly, plaintiffs' claim under the Clayton Act will be dismissed.

### 2.  Sherman Act

Section 1 of the Sherman Act provides:  "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1.

Plaintiffs allege "there is a significant threat that ABI and Constellation will fix prices in that Constellation will follow ABI price increases by agreement and understanding."  (See Compl. ¶ 119.)  The Second Amended Complaint, however, lacks any factual allegations supporting such a claim, and relies, instead, solely on conclusory allegations.  (See, e.g., SAC ¶ 10 ("The acquisition . . . may and probably will result in price fixing between ABI, Modelo and Constellation . . . ."); ¶ 36 ("This action is brought . . . to prevent the probable price fixing by ABI and Constellation . . . ."); ¶ 98 ("Constellation has conspired with ABI, the terms of which include those in the Revised Agreement and Constellation's agreement to follow ABI's price leads.").)

Moreover, to the extent plaintiffs allege there is a threat of future price-fixing, such claim fails for the reason that a threat of future conduct does not constitute a claim under the Sherman Act, which requires an actual, existing contract or conspiracy in restraint of

1  trade.  See Twombly, 550 U.S. at 556 (holding Sherman Act claim "requires a complaint

2  with enough factual matter (taken as true) to suggest that an agreement was made").  To

3  the extent plaintiffs argue the revised agreements themselves constitute price-fixing, those

4  agreements, as discussed above, provide no support for such a claim.  Lastly, to the extent

5  plaintiffs allege there exists an agreement between the parties other than the revised

6  agreements, plaintiffs fails to do so with the requisite specificity.  See id. at 557 (holding "a

7  conclusory allegation of agreement at some unidentified point does not supply facts

8  adequate to show illegality"; holding plaintiff must plead facts "plausibly suggesting (not

9  merely consistent with) agreement").

10       In their opposition, plaintiffs, for the first time, contend defendants have violated the

11 Sherman Act through their "agreement to divide markets and customers."  (See Opp'n at

12 20:24.)[6]  At oral argument, in support thereof, plaintiffs relied on § 2.12(f) of the Amended

13 and Restated Sub-License Agreement, which prohibits Constellation from selling Grupo

14 Modelo beers outside the United States.  Plaintiffs, citing Timken Roller Bearing Co. V.

15 United States, 341 U.S. 593 (1951), argue said section, in conjunction with the provisions

16 of that agreement prohibiting ABI from selling Grupo Modelo beers in the United States,

17 constitutes an agreement to restrain foreign trade.

18       Timken, however, is readily distinguishable on its facts.  In Timken, the British,

19 French, and United States divisions of an Ohio corporation entered into "comprehensive

20 agreements providing for a territorial division of the world markets for antifriction bearings,"

21 by which said parties:  "(1) allocated trade territories among themselves; (2) fixed prices on

22 products of one sold in the territory of the others; (3) cooperated to protect each other's

23 markets and to eliminate outside competition; and (4) participated in cartels to restrict

24 imports to, and exports from, the United States."  See id. at 595-96.  Given such

25

26

27       [6] Plaintiffs also rely on § 5.7 of the Stock Purchase Agreement to support such a
28 theory.  That section, however, as discussed above, is no longer part of the revised
   agreements.

11

1  circumstances, the Supreme Court found a violation of § 1 of the Sherman Act.[7]

2         Here, by contrast, ABI and Constellation have not entered into any agreement

3  allocating the markets for beer.  No products or competitors have been removed from the

4  United States market or, for that matter, from any other market.  Plaintiffs have not alleged,

5  for example, that ABI will stop selling its other brands of beer and stop competing with

6  Constellation and other beer producers in the United States (see SAC ¶ 1 (alleging ABI,

7  independent of challenged merger, "controls 50% of the manufacture, distribution, and sale

8  of beer in the United States"), nor have plaintiffs shown Constellation is precluded from

9  selling its own or other brands of beer either within or outside the United States.

10        Accordingly, plaintiffs' claim under the Sherman Act will be dismissed.

11     **3.  Tunney Act**

12        Plaintiffs allege defendants violated the Tunney Act, 15 U.S.C. § 16, by failing to wait

13  sixty days for public comment as to the Proposed Final Judgment before consummating

14  their merger.  (See SAC p. 31-32, ¶¶ 5-7.)  The Tunney Act provides, in part, as follows:

15        Any proposal for a consent judgment submitted by the United States for
          entry in any civil proceeding brought by or on behalf of the United States
16        under the antitrust laws shall be filed with the district court before which
          such proceeding is pending and published by the United States in the
17        Federal Register at least 60 days prior to the effective date of such
          judgment.
18

19  See 15 U.S.C. § 16(b).  The Act further requires the government to file in the district court

20  any written comments received from the public, as well as the government's responses

21  thereto, and additionally requires the district court, "[b]efore entering any consent judgment

22  proposed by the United States," to "determine that the entry of such judgment is in the

23  public interest."  See id. § 16(b) & (e).  Plaintiffs contend "the Act does not permit closing

24  the transaction before the 60 day comment period has run and until the Government has

25

26  _____

27        [7] The Supreme Court also held "common ownership or control of the contracting
    corporations does not liberate them from the impact of the antitrust laws," see id. at 974, a
28  holding later overruled in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752
    (1984).

1    responded to the comments and the Court has determined that the settlement is in the

2    public interest."  (See Opp'n at 25:18-21.)

3        Defendants argue there is no private right of action under the Tunney Act.  See Am.

4    Antitrust Inst., Inc. v. Microsoft Corp., No. 02-138, 2002 U.S. Dist. Lexis 26567, at *23-24

5    (D.D.C. Feb. 19, 2002) (holding Tunney Act does not provide for private cause of action).

6    In their opposition, plaintiffs respond, without further elaboration, that "[i]t is immaterial that

7    the Tunney Act does not provide a private cause of action."  (See Opp'n at 25:18.)  The

8    Court need not determine whether a private cause of action exists under the Tunney Act,

9    however, as, even if such cause of action exists, defendants, as discussed below, have not

10   acted in any manner precluded by said statute.

11       In particular, plaintiffs assume that once the government files a lawsuit challenging a

12   merger or acquisition, the subject companies may not complete such transaction until the

13   district court enters final judgment.  Nothing in the Tunney Act so requires.[8]  Rather, to stop

14   a proposed merger prior from going forward prior to judgment, a preliminary injunction

15   must be sought and obtained.  See 15 U.S.C. § 25 (providing, once government files suit,

16   "court may at any time make such temporary restraining order or prohibition as shall be

17   deemed just in the premises"); United States v. BNS, 858 F.2d 456, 461 (9th Cir. 1988)

18   (affirming entry of preliminary injunction "to maintain the status quo pending completion of

19   the public interest review mandated by the statute").[9]  While practical difficulties may well

20   be presented where, after consummation of a merger, a district court finds a proposed

21   consent judgment is not in the public's interest, such court nonetheless retains the

22   authority to take remedial action by, for example, an order of divestiture.  Consequently,

23   consummation of a merger prior to expiration of the sixty-day comment period and entry of

24   judgment does not, contrary to plaintiffs' argument, render the above-referenced provisions

25

26       [8] The only relevant statute providing for premerger delay is 15 U.S.C. § 18a.  See 15
     U.S.C. § 18a (requiring "premerger notification" to DOJ and thirty-day "waiting period" prior
27   to acquisition).

28       [9] The Ninth Circuit's order was first published in 848 F.2d 945 (1988); the court
     thereafter published its reasoned decision in the reporter cited above.

13

"mere surplusage."  (See Opp'n at 27:14-18.)

Accordingly, plaintiffs' claim under the Tunney Act will be dismissed.

**4.  State Law Claims**

Relying on all of the above-discussed allegations, and with no further citation or elaboration, plaintiffs bring a claim under "state statutes prohibiting price-fixing and allowing suit by direct and indirect purchasers."  (See SAC at 28:4.)  Defendants argue any such claims must be dismissed because plaintiffs do not identify any specific statute and, consequently, do not provide them with the requisite fair notice.  See Fed. R. Civ. P. 8(a). The Court agrees.

Consequently, plaintiffs' claims for relief under unspecified state statutes will be dismissed.

**5.  Leave to Amend**

By their respective motions, defendants seek dismissal of all claims without leave to amend.  Dismissal without leave to amend is appropriate where, inter alia, "amendment would be futile."  See Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1039 (9th Cir. 2002). Here, as discussed above, the revised agreements make clear plaintiffs are unable to allege any facts showing the merger and accompanying agreements result in a violation of the Clayton Act, and, after twice attempting to allege a Sherman Act violation, plaintiffs have demonstrated their inability to marshal any facts to support such a claim; plaintiffs' claim under the Tunney Act likewise fails.  Consequently, such claims will be dismissed without leave to amend.  As to plaintiffs' state law claims, plaintiffs, at the hearing, stated they are able to plead violations of specific statutes; accordingly, plaintiffs will be afforded leave to amend to allege, if they so choose, any such claims.

**B.  MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs move for "an order requiring [defendants] to hold their assets separate and apart during the pendency of these proceedings as provided by the 'Hold Separate and Preservation Obligations' outlined on pages 10-18, sections VI-X, of the Stipulation and Order and the 'Firewall' provision outlined in the Proposed Final Judgment on page 24."

14

1 | (See Mot. at 3:4-10.)

2 | "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed

3 | on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

4 | that the balance of equities tips in his favor, and that an injunction is in the public interest."

5 | Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)."[10]  Here, plaintiffs fail to

6 | make the requisite showing.

7 | First, the hold separate obligations ordered by the D.C. Court and identified by

8 | plaintiffs were in place only until the time the proposed transactions were consummated.

9 | (See Lent Decl. Ex. 5, Stipulation and Order at 10-18.)  At this juncture, ABI has acquired

10 | Grupo Modelo and incorporated it into its existing structure, and Constellation has acquired

11 | Crown and the Piedras Negras brewery and has commenced operation and expansion

12 | thereof.  Consequently, the rationale for said earlier-ordered restrictions is no longer

13 | applicable.  Second, with respect to the firewall provision contained in the Proposed Final

14 | Judgment, plaintiffs fail to show they are likely to suffer irreparable injury in the absence of

15 | an order from this Court, for the reason that the Stipulation and Order issued by the D.C.

16 | Court, which order remains in effect pending entry of final judgment by that court, already

17 | requires the parties to comply with said provision.

18 | Plaintiffs have not pointed to any other practicable form of injunctive relief.  Further,

19 | as discussed above, plaintiffs have failed to state a claim upon which relief can be granted

20 | and, accordingly, have not shown a likelihood of success on the merits.

21 | Accordingly, plaintiffs' motion will be denied.

22 | //

23 | //

24 | //

25 |

26 | [10] In their opening brief, plaintiffs argue a more lenient standard applies to "hold
27 | separate orders," which, they assert, can be issued even without a showing of likelihood of
success on the merits.  (See Mot. at 10:17-25).  As defendants point out, the authority on
28 | which plaintiffs rely for such proposition consists of three district court cases that were
decided in the 1970s and thus predate Winter.

**CONCLUSION**

1.  Defendants' motion to dismiss is hereby GRANTED as follows.

    a.  Plaintiffs' claims for relief under the Clayton Act, Sherman Act, and Tunney Act are hereby DISMISSED.

    b.  Plaintiffs' claim for relief under unspecified state laws is hereby DISMISSED with leave to amend.

2.  Plaintiffs' motion for a preliminary injunction is hereby DENIED.

3.  Plaintiffs' amended complaint, if any, shall be filed no later than October 11, 2013.

**IT IS SO ORDERED.**

Dated: September 13, 2013

MAXINE M. CHESNEY
United States District Judge

16